# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DAN TRUJILLO,

       Plaintiff,

v.                                        No. CIV 02-711 LFG

JO ANNE B. BARNHART,
Commissioner of Social Security,

       Defendant.

## MEMORANDUM OPINION AND ORDER
## REMANDING MATTER FOR ADDITIONAL ADMINISTRATIVE HEARING

Plaintiff Dan Trujillo ("Trujillo") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Trujillo was not eligible for Disability Insurance ("DIB") or Supplemental Security Income ("SSI") benefits. Trujillo moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 8.]

### Background

Trujillo was born on August 25, 1950. He was 49 years old when the administrative hearing was held. He has a high school education and three years of college. His past relevant work experience was performing mobile home set up and delivery. He worked for his father's mobile home business for about 27 years until August 1998, when he allegedly no longer could work.

1

On November 6, 1998, Trujillo submitted an application for DIB, claiming an onset date of August 18, 1998.  [Tr. at 50.]  On December 1, 1998, Trujillo filed an application for SSI, alleging the same onset date.  [Tr. at 159.]  He contends that he is unable to work due to pain in both knees, "especially the right."  [Tr.at 70.]

Administrative Law Judge Gary L. Vanderhoof held an administrative hearing on May 10, 2000 in Santa Fe, New Mexico.  Trujillo was present and accompanied by a non-attorney representative.  [Tr. at 171.]  In a decision, dated May 25, 2000, Judge Vanderhoof found that Trujillo was not eligible for benefits.  Judge Vanderhoof determined, in part, that Trujillo had the residual functional capacity ("RFC") to perform a wide range of sedentary work.  [Tr. at 25.]  On April 19, 2002, the Appeals Council denied Trujillo's request for review, after considering the applicable statutes, regulations and rulings, as well as the new listings for musculoskeletal impairments, effective February 19, 2002.[1]  [Tr. at 5.]  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

---

[1]The Appeals Council also considered contentions in the requests for review raised by Trujillo's representative as well as a medical record from Dr. Lipscomb.  In addition, the Appeals Council recognized that Trujillo was awarded benefits based on a later filed application but did not find that this later award warranted a change in the ALJ's decision.  [Tr. at 5-7.]

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[8] age, education and past work experience, he is capable of performing other work.[9] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10]

At step five, the ALJ can meet his burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids."  Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to

---

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

[8]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

demonstrate that the plaintiff can perform other jobs in the economy.  Id. at 669-670.  Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category."  Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)).  Non-exertional limitations can include mental impairments.  The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable.  Id.  However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work."  Id. (internal citations omitted.)  In this case, the ALJ used the grids in reaching his decision at step five of the analysis and did not utilize a vocational expert.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal

standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for

purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the
> evidence, but an ALJ is not required to discuss every piece of
> evidence. Rather, in addition to discussing the evidence supporting
> his decision, the ALJ must discuss the uncontroverted evidence he
> chooses not to rely upon, as well as the significantly probative
> evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If

supported by substantial evidence, the decision of the Commissioner is conclusive and must be

affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the

Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After thoroughly and carefully reviewing the medical records, the ALJ concluded that Trujillo

was not disabled under the standards of the Social Security Act. [Tr. at 20-26.] In reaching this

decision, Judge Vanderhoof made the following findings: (1) Trujillo did not engage in substantial

gainful activity during the pertinent time frame; (2) Trujillo had an impairment or combination of

impairments that were considered "severe" (including bilateral degenerative joint disease of the knees

and major depression); (3) these impairments were not severe enough to meet or equal a Listing; (4)

Trujillo's allegations of his limitations were not totally credible; (5) Trujillo retained a RFC to perform

a wide range of sedentary work; (6) he was unable to perform his past relevant work; (7) he was a

"younger individual" with more than a high school education; (8) Trujillo had no transferable skills

from his past relevant work; (9) although his exertional limitations did not allow him to perform the

full range of sedentary work, in using the grids, there were a significant number of jobs in the national

economy that Trujillo could perform; and (10) Trujillo was not under a disability, as defined by the

Social Security Act, at any time through the date of the ALJ's decision. (Tr. at 25-26.)

In this appeal, Trujillo generally argues that reversal and remand are required because the ALJ's decision was not supported by substantial evidence and the Commissioner failed to carry her burden of proof or apply correct legal standards to the case. More specifically, Trujillo contends that he met the Listing criteria of 1.02(A), that the ALJ's finding that he could perform a "significant" or "wide" range of sedentary work was erroneous and unsupported, that the ALJ's use of the grids was erroneous and unsupported, that the Commissioner failed to properly assess medical opinion evidence, and that the credibility determinations were unsupported and erroneous. Trujillo also asserts that on remand, the period of review should be limited to the closed period ending on May 25, 2000, the date he was found eligible for benefits with respect to a more recent application.[11] The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the ALJ's decision and because the decision is a correct application of the regulations. [Doc. 10.]

After a review of the entire record, this Court finds that this matter should be reversed and remanded for additional analysis.

### Summary of Trujillo's Work History, Medical Conditions and Treatment

Trujillo was born and raised in Espanola, New Mexico. [Tr. at 119.] He was enrolled in pharmacy school at UNM, but did not obtain his degree due to "marital problems." [Tr. at 119.] He claimed his inability to complete his education made him feel like the "black sheep" in his family. He was married for about 20 years since the age of 17 and has two adult sons, one who received a scholarship to be in the aerospace industry and the other who was studying computer engineering.

---

[11]On about June 2, 2000, after Judge Vanderhoof denied his benefits on May 25, 2000, Trujillo re-applied and was awarded benefits, with an onset date of May 26, 2000. [Doc. 9, p. 1; tr. at 6.]

[Tr. at 120.]  At some point, Trujillo developed alcohol problems and  described alienation from his sons due to these problems.  He has had a history of DWI's.  His alcohol abuse was extensive with a history of "DT's, blackouts, and seizures."  [Tr. at 120.]  His driver's license was revoked due to alcohol abuse.  His last DWI was in 1996-97.  Trujillo is currently sober and participating in AA.  [Tr. at 120.]

From about the age of 22 until August 1998, he worked in Espanola at El Valle Mobile Home Industry, a mobile home business owned by his father.  He lives in a mobile home in Espanola that he is paying for.  He believes he was mentally abused by his father who was a perfectionist and had his own alcohol problems.  [Tr. at 120.]

In about 1994, Trujillo had some kind of arthroscopic procedure performed on his right knee. He also stated that he had had a left hip fracture at some point and that the "hardware was still there." [Tr. at 120.]

The first medical records appearing in the administrative record are from 1998.  An August 28, 1998 medical record indicates Trujillo complained of chronic knee pain, for which he was taking Alleve.  His knees were bothering him since 1992.  He had "ETOH hepatitis," and had no alcohol in the last two years.  [Tr. at 108.]  An x-ray was ordered and Voltarin was prescribed.  The radiologists report from the August 28, 1998 x-ray of the knees states that mild osteopenia[12] was observed with osteophytes[13] projecting off the medial aspect of the distal tibia and proximal fibula.  [Tr. at 107.] Multiple radio-opaque loose bodies were seen in the suprapatellar bursa.  The left knee views

---

[12]"Osteopenia" is defined as reduced bone mass due to a decrease in the rate of osteoid synthesis to a level insufficient to compensation normal bone lysis.  Dorland's, p. 943.

[13]"Osteophyte" is defined as a bony excrescence or osseous outgrowth.  Dorland's, p. 943.

demonstrated no fractures or dislocation.  Mild degenerative disease was observed with slight narrowing of the patellar femoral compartment.  The radiologist's impression was "mild degenerative disease" involving both knees.  [Tr. at 107.]

On October 15, 1998, Dr. Robert Lipscomb of the Santa Fe Orthopaedic Associates wrote a letter on behalf of Trujillo stating that he had seen Trujillo for severe osteoarthritis of the right knee.  [Tr. at 106.]  The x-rays of the right knee revealed bone on bone articulation of the medial compartment and several loose bodies in the knee, along with arthritic spurring.  Dr. Lipscomb concluded that Trujillo was unable to work because of significant pain in his right knee and "somewhat lesser pain in the left knee" that had some moderate osteoarthritic change.  [Tr. at 106.]  Dr. Lipscomb also stated it appeared that Trujillo would need surgery on his right knee, either an osteotomy or "perhaps a knee replacement."  He did not believe it was reasonable to expect Trujillo to return to work until he underwent some sort of surgery for pain relief.  [Id.]

On November 6, 1998, Trujillo filed an application for DIB.  It was denied on about December 21, 1998.  [Tr. at 35.]  On December 9, 1998, Trujillo filed another application but for SSI benefits.  [Tr. at 162.]  It also was denied.

On December 21, 1998, a RFC Assessment was performed.  The exertional limitations noted were occasional lifting of 20 pounds, frequent lifting of 10 pounds, standing or walking at least 2 hours, sitting 6 hours, and unlimited as to ability to push and pull.  [Tr. at 110.]  No other limitations were observed.  The medical consultant disagreed with the treating physician's conclusion that Trujillo was totally unable to work.  The consultant observed that medication would decrease Trujillo's knee pain until surgery could be done.  [Tr. at 115.]

On January 20, 1999, a different medical consultant reviewed the December 21, 1998 RFC Assessment.  This consultant agreed with most of the limitations as stated but disagreed that Trujillo did not have any postural limitations.  He explained that the x-ray showed evidence of "advanced degenerative joint disease on the right knee and to a lesser degree in the left knee."   Trujillo was observed as limping and having pain.  Thus, Trujillo was limited in the postural activities of climbing, balancing, stooping, kneeling, crouching and crawling, which could be performed only occasionally because all of those postures increased the pressure on the knee and would aggravate the pain "many times over."  [Tr. at 117.]

On May 26, 1999, Dr. Michael Gzaskow, a psychiatrist, performed a comprehensive psychiatric consultation.  [Tr. at 119.]  Dr. Gzaskow reviewed some of the underlying disability submissions by Trujillo and Dr. Lipscomb's letter. Dr. Gzaskow initially noted that Trujillo was neatly dressed with a somewhat tense posture and variable anxious/sad facial expression.  [Tr. at 121.] Trujillo was alert and cooperative during the exam which made his testing and mental status valid. He had good eye contact during the interview but was close to tears at times.  He made no attempts to be evasive.  General IQ was estimated to be average.  [Tr. at 121.]

Trujillo told Dr. Gzaskow that he had been working for his 73 year old father's mobile home business and that he had a very poor relationship with his father.  Trujillo apparently sustained his knee injuries while working for his father.  Trujillo also stated that his chronic physical problems and failed marriage with secondary alcoholic problems produced chronic depression.

Upon testing, Trujillo exhibited no deficits in immediate recall, recent or remote memory.  He performed calculations and abstractions well.  His general fund of knowledge was average to above average.  His insight was good, but his judgment was marginal.  [Tr. at 122.]  His three wishes were

to fix his knee, good health and for his boys to be happy and successful.  Dr. Gzaskow's diagnostic impressions were: major depression (recurrent without psychosis (severe)); chronic alcohol abuse in current remission; status post arthroscopy on the right knee, status post left hip surgery, and questionable hepatitis by history.  [Tr. at 122.]  Trujillo was able to relate to others, understand and follow directions, perform simple tasks and manage his funds.  Trujillo stated that he could not withstand the stress and pressure associated with day-to-day work because of his orthopedic problems and secondary depression.  [Id.]

On June 4, 1999, Dr. E. Chiang performed a psychiatric assessment for purposes of his disability application.  [Tr. at 123.]  Dr. Chiang noted the presence of affective disorders (major depression) and substance addiction disorders but that Trujillo's psychiatric impairment was non-severe and that there were no objective problems with concentration, persistence or pace.  [Tr. at 124.]  Dr. Chiang concluded that Trujillo had no restrictions as to daily living activities, slight difficulties in maintaining social functioning, no deficiencies in concentration, etc. and no episodes of deterioration.  [Tr. at 130.]

On June 8, 1999, the original December 1998 denial of DIB benefits was affirmed.  [Tr. at 36.]

On August 13, 1999, Trujillo saw Dr. Lipscomb, the orthopaedic physician.  Dr. Lipscomb commented about significant osteoarthritis of Trujillo's right knee medial compartment and his symptoms of osteoarthritis in the other knee.  Trujillo had had steroid injections in the past which were expected only to last a few weeks.  Trujillo complained that the pain was worsening in his right knee and that he could hardly be up at all.  The x-ray taken that day showed "severe joint space collapse, medial compartment right knee, moderately severe left knee."  He had bone on bone

10

articulation in the right knee.  The x-ray showed significant worsening in both knees as compared to a 1996 x-ray.  Dr. Lipscomb concluded that Trujillo was disabled because of his knee problem.  He believed that the only reliable way to resolve Trujillo's problem was through a total knee replacement.  However, Trujillo did not have any insurance coverage.

It appears that Trujillo first saw psychiatrist Dr. Judy Walker in about October 1999.  [Tr. at 140.]  Trujillo was seen for depression but told Dr. Walker that he was not depressed until he was told in 1998 that he needed a knee replacement.  He wanted to have the procedure done but did not have the insurance.  He felt "stuck."  He was having some insomnia, felt isolated, watched television during the day and felt hopeless about the future. He had crying spells daily.  He had fleeting thoughts about suicide but pushed it out of his mind.  [Tr. at 140.]

He also told Dr. Walker that his relationship with his older son was not great and the younger son called him only sporadically.  Neither son visited him.  His use of alcohol began in 1986.  He last drank three years ago.  Both of his knees hurt, and he could not recall the last physical exam he had. [Tr. at 140.]

Dr. Walker observed him as cooperative and well groomed.  He was logical and goal directed. He exhibited a serious mood.  She diagnosed him with major depression, "single episode severe with possible psychotic features."   The record indicates "ETOH Dep., in Sust. Partial Remission."  [Tr. at 140.]  She assigned Trujillo a GAF of 55.  Dr. Walker prescribed Prozac and Trazadone.

On October 8, 1999, Trujillo complained of insomnia and crying spells to the clinical therapist. He felt like "ending it all" sometimes.  He found food tasteless and would take his life if it were not for his belief in God.  [Tr. at 142.]

On October 21, 1999, Trujillo was upset because he father would not loan him a truck. Trujillo complained that he had worked for his father for 27 years and that now when he needed help, his father was cold and unwilling to help him.  Trujillo was to continue to see his AA sponsors three times a week.  He was crying and depressed.  [Tr. at 141.]

On October 28, 1999, the administrative hearing was scheduled before Judge Vanderhoof. [Tr. at 171.]  Trujillo's representative requested a continuance because Trujillo was unable to attend due to not feeling well.  [Tr. at 172.]

On November 17, 1999, Dr. Walker noted that Trujillo was sleeping better with Trazadone. He was "down" but not suicidal.  The Prozac made him drowsy.  He denied alcohol or illicit drug use. He was feeling some paranoia at night when his fears broke in and occasional paranoia during the day. [Tr. at 139.]

An un-dated psychiatrist's record by Dr. Walker shows that Trujillo felt that Prozac was helpful although he still felt depressed.  He had some suicidal ideation but was not going to act on it.  He slept six hours a night with the help of Trazadone.  He exhibited some psychotic features.  [Tr. at 136.]

A therapist's note, dated December 1, 1999, states that Trujillo saw his children in Albuquerque over Thanksgiving and that he enjoyed the visit.  However, his knee was hurting him immensely but he did not want to take pain medication because he heard "it is bad."  [Tr. at 138.] He still had crying spells and felt hopeless.  He denied alcohol use and was seeing an AA sponsor.

A December 21, 1999 psychiatric progress note reflects Trujillo's continued knee pain and the reconstruction surgery that he hoped would happen soon.  He mentioned his inability to work because of continued pain.  He continued to be sober, but was mostly inactive.  [Tr. at 135.]

On December 23, 1999, Trujillo was seen by a mental health therapist at the Health Centers of Northern New Mexico.  [Tr. at 137.]  He had a flat affect, looked sad and was emotional.  He was well groomed.  Although his antidepressant medication was increased, he still had crying spells and felt hopeless.  He had fleeting suicidal ideation and could only sleep with the assistance of medication.  The pain in his knee was getting worse, and the cold weather made it worse as well.  [Tr. at 137.]

A social worker's progress note from January 19, 2000 shows that Trujillo stated that he should be working and in the work place but that he still was crying.  [Tr. at 134.]  Trujillo was worried about his finances and bills but was not suicidal.  He felt some joy when he saw his sons at Christmas and believed that another antidepressant might help.  He was grieving the loss of his health.

On February 2, 2000, Trujillo told Dr. Walker that he felt worthless because he was not working.  He reported good compliance with medications.  He still, however, had paranoid ideation and thought others were talking about him.  He feared being broken into at his trailer.  Dr. Walker noted that Trujillo did very little in terms of daily activities, that he cried every day, had poor concentration and remained in his pajamas most of the day due to depression.  [Tr. at 155.]

In mid-February 2000, Trujillo again saw Dr. Walker for medication management.  He was drowsy on one of the medications.  He felt sad and angry and guilty for not working.  [Tr. at 152.]  He could not tell if the Prozac was helping.  Dr. Walker was changing his anti-depressant medication.  On February 15, 2000, Trujillo told Dr. Walker that he needed a medicaid card to get a knee replacement so that he could return to work.  [Tr. at 153.]  Trujillo told Dr. Walker that he had not used alcohol for three years, that he saw his sponsor three times a week but did not like AA meetings and did not attend them.  His typical day at home involved watching television and doing a little

13

cooking for himself.  Dr. Walker noted that Trujillo was very depressed but not at serious risk presently as long as he remained sober.  [Tr. at 153.]

On February 18, 2000, Trujillo thought his main problem was being a "bum, not doing anything - bored."  [Tr. at 149.]  During the session, Trujillo exhibited good insight and understanding, a sense of humor, and a willingness to change his perspective.  He recognized that his feeling that anyone who does not work is a bum was too severe.

On February 22, 2000, Trujillo appeared slightly less depressed and had had some contact with his family.  [Tr. at 148.]  On February 29, 2000, Trujillo was in slightly better spirits although he felt sad.  He told the therapist that he could not do anything physical because he started hurting.  [Tr. at 147.]  On March 1, 2000, Trujillo said that he tried to think about his achievements but that it backfired and he was depressed again.  During the session, he showed good insight and a willingness to work in therapy.  [Tr. at 146.]  On March 7, 2000, Trujillo was anxious that his disability application had not moved forward.  He wanted an update on his health records to be sent to his disability representative.  [Tr. at 145.]

On March 8, 2000, Dr. Walker saw Trujillo for nausea, abdominal cramping and anxiety.  He mood was "unchanged – down."  He was able to smile appropriately.  Dr. Walker made some changes to his medications and was going to consider increasing his Prozac at some point.  [Tr. at 144.]

On March 23, 2000, Trujillo saw Dr. Lipscomb, the orthopaedic physician.  Trujillo had significant pain in his knees, particularly the right knee, due to osteoarthritis.  Trujillo felt the pain was worsening.  He was not on any anti-inflammatory medications.  Upon exam, Dr. Lipscomb noted that

he had some "mild varus[14] angulation of the right knee with standing, a lot of tenderness and moderate swelling medially over the medial compartment joint line." The left knee showed less tenderness and swelling. An x-ray was taken that showed "bone on bone articulation medial compartment of the right knee and significantly decreased joint space on the left knee" although it was not "bone on bone." Dr. Lipscomb's assessment was that Trujillo was "significantly limited by this pain. He is unable to work because he is unable to be on his feet." Trujillo was going to try to use a cane to see if it might help. Dr. Lipscomb's recommended approach was a total right knee arthroplasty[15] which should relieve his pain "fairly well" although there were no guarantees. Dr. Lipscomb gave Trujillo samples of an anti-inflammatory medication (Lodine) because Trujillo could not afford to pay for medicines.

On May 4, 2000, Dr. Walker wrote a note on behalf of Trujillo, stating that she was his attending physician. She stated that Trujillo suffered from "severe major depression disorder with psychotic features (at times)." She opined that he would "certainly not be able to work in any job as he would be unable to sustain concentration for any length of time." He had trouble reading the newspaper, etc. Presently, she observed that he was paranoid and suffered from chronic pain, anxiety and depression." [Tr. at 157.]

On May 10, 2000, the ALJ conducted the administrative hearing that had been continued from October 28, 1999. [Tr. at 174.] Trujillo agreed that he had been assigned GAF scores of 55 to 65. [Tr. at 178.] He believed his medications sometimes helped and sometimes did not. His mother

---

[14]"Varus" means bent inward; denoting a deformity in which the angulation of the part is toward the midline of the body. Dorland's Illustrated Medical Dictionary ("Dorland's"), 26th ed., p. 1438.

[15]"Arthroplasty" is defined as plastic surgery of a joint; the formation of movable joints. Dorland's, p. 124.

assisted him with shopping and cooking.  [Tr. at 178-79.]  Trujillo discussed a prior arthroscopic

surgery to his right knee, and was using a cane to assist him at the hearing.  [Tr. at 180, 189.]  He

stated that Dr. Lipscomb had limited his lifting to 15 pounds, and that he "tried" to stay within that

limit.  [Tr. at 180.]

The ALJ asked Trujillo to clarify the number of DWI's he had had.  He testified that he had

had four DWI's rather than 15 as one record indicated.  [Tr. at 180.]  Judge Vanderhoof also noted

that some doctors had stated that Trujillo's alcohol use was in full remission while another doctor had

crossed that information out and said it was in partial remission.  [Tr. at 180.]  Trujillo explained that

he had a problem with alcohol and that he went into rehabilitation for his drinking problem three

times, the last of which was in August 1996.  He had not had a drink since that date.  [Tr. at 181.]

Since his knee surgery, Trujillo testified that he awoke at 5 or 6 a.m. and dressed himself at

his own pace.  He typically got up, turned on the television and made himself a cup of coffee.  He

then sat or lay down on the couch.  For lunch, he ate out of a can or used the microwave.  During

the rest of the day, he tended to remain in the house, watched television or lay down.  He had no

social activities and did not go to church or see friends.  [Tr. at 182-83.]

The ALJ asked Trujillo about the workers' compensation he received for six months (from

August 1998 through February 1999), but Trujillo clarified that he actually received unemployment

compensation rather than workers' comp.  [Tr. at 184-86.]  Trujillo admitted that to receive

unemployment compensation, he had to file a report every week stating that he was ready and willing

to work.  He explained that he was looking for an "easy job."  [Tr. at 185.]  He was never

interviewed for work then.  Trujillo's representative asked Trujillo whether he was actually looking

for work and stating he was capable of work when he was claiming a disability in his application for

16

DIB and SSI benefits.  Trujillo responded that he needed some kind of income after he was "laid off" or after he stopped working "because of medical reasons."[16]  [Tr. at 187.]

As of the May 2000 hearing, Trujillo believed he needed a total right knee replacement and that his left knee would also require the same surgery eventually.  He had not had surgery up to this point due to lack of finances and insurance.  [Tr. at 190.]  Trujillo testified that he had severe and constant pain in both knees and that he elevated his leg about six to eight hours each day.  [Tr. at 190-91.]  The pain was present 24 hours a day, and he rated it an "8" on a scale of 10, assuming a "10" required an emergency visit to the hospital.  [Tr. at 192.]  Pain and anti-inflammatory medications did not help.

Trujillo testified further that all activities aggravated his knees since the pain was a constant.  He had to stand up during the hearing after sitting for awhile.  [Tr. at 192.]  He was unable to crouch, squat, or kneel.  To climb stairs, he would do it one leg at a time.  He had no hobbies although he used to like to fish.  He could only stand for five to ten minutes, walk for 25 to 30 yards, and sit for 15-20 minutes.  [Tr. at 197-98.]

Trujillo stated that he was very depressed and became very paranoid.  He did not trust anyone and felt people were out to get him.  He was unable to get motivated and suffered from anxiety.  He felt worthless and useless.  [Tr. at 194.]  The anti-depressant medications did not help him although the medicine for insomnia did help him sleep.  He was having anxiety attacks four times a day.  [Tr. at 195.]  He only went out to get the mail or to go to his appointments.  His mother cooked for him, did his laundry and cleaned the house.  [Tr. at 196.]

---

[16]The Court does not consider the application for or receipt of unemployment benefits determinative of the question of whether a claimant is able to work.  Roberts v. Callahan, 971 F. Supp. 498, 501-02 (D.N.M.1997).

Trujillo testified that he wanted to get the replacement surgery, continue with counseling and return to work.  [Tr. at 197, 198.]  He did not believe he could do any kind of sedentary job for 8 hours where he could alternative between sitting and standing.

## Discussion

## STEP THREE – LISTING ANALYSIS

A claimant has the burden of proving that his condition meets or equals a Listing for purposes of step three analysis.  Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92 (1990).  In order to satisfy his burden, the claimant must demonstrate that his impairment meets or equals all of the specified medical criteria for the Listing in question.  If the impairment meets only some of the criteria, regardless of severity, a Listing will not be met.  Id., 110 S.Ct. at 891.

At step three, the ALJ must determine whether the "medical findings" at least equal in severity and duration as those criteria set forth in a Listing.  Bernal v. Bowen, 851 F.2d 297, 300 (10th Cir. 1988).  "'Medical findings' include symptoms (claimant's own description of his impairments), signs (observations of anatomical, physiological and psychological abnormalities which are shown by clinical diagnostic techniques) and laboratory findings."  Id. (citing 20 C.F.R. §§ 404.1526(a); 404.1528(a)).  The claimant's descriptions, alone, are insufficient to establish the criteria of a Listing. Id.  The step three analysis requires a comparison of those medical findings and evidence with the Listing criteria.

Here, Judge Vanderhoof considered whether Trujillo met the Listing of 1.03 (arthritis of a major weight bearing joint due to any cause).  This was the pertinent Listing in effect at the time of the ALJ hearing and decision in May 2000.  However, subsequent to May 2000, the pertinent musculoskeletal Listings were revised, and Listing 1.02(A) went into effect on February 19, 2002,

which was several months before the Appeals Council rendered its ruling denying Trujillo's request for review.  Both parties in their briefs primarily argue that Trujillo's impairment should be analyzed under revised Listing 1.02(A).

In November 2001, the Commissioner published final rules revising the musculoskeletal Listings.  66 Fed.Reg. 58,010 (2001).  *See* Greer v. Barnhart, 201 F. Supp. 2d 897, 903 (N.D. Ill. 2002) (discussing the Commissioner's final rules, revisions and effective dates, etc.).  The final rules state that the "revised musculoskeletal listings only apply to claims pending at the administrative level on or after the effective date and do not apply to claims currently pending in federal court."  Greer, 201 F. Supp. 2d at 903.  In Greer, the trial court applied the Listing criteria in effect prior to the revision because the ALJ and Appeals Council issued rulings prior to the effective date of February 19, 2002.  That is not the case here.

In this case, the Appeals Council issued its decision after February 19, 2002, and acknowledged revised musculoskeletal Listing 1.02(A).  Thus, the revised Listing would apply to Trujillo's disability claim because it was still pending at the administrative level as the Appeals Council had not yet rejected Trujillo's request for review.  In its decision, the Appeals Council stated only that it "considered the final regulations, effective February 19, 2002, implementing the new listings for musculoskeletal (and related) impairments.  The new regulations do not provide a basis to change the Administrative Law Judge's decision."  [Tr. at 5.]

Other than this one sentence explanation, the Appeals Council gave no other reasons why Trujillo's impairment was not listing-level severity under newly revised Listing 1.02(A).  Nor could the ALJ analyze Trujillo's impairment in terms of revised Listing 1.02(A) since it was not in effect when the ALJ performed his analysis.  In Jefferson v. Barnhart, 209 F. Supp. 2d 1200, 1204-05 (N.D.

Okla. 2002), the federal court reviewed a similar scenario and concluded that it was left with nothing to review. "The Court would have to review the record for itself to determine whether Plaintiff's impairment is functionally equal to a Listing under [revised regulation]. This the Court is not permitted to do under 42 U.S.C. § 405(g)." Id.

Because the Appeals Council's decision is not supported by substantial evidence, the case must be reversed and remanded so that the Commissioner can conduct the analysis required under revised Listing 1.02(A). *See id.* Therefore, on remand, the ALJ should compare each of the listed criteria for 1.02(A) to the medical findings, discuss the evidence fully and explain his findings at step 3. Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996).

On remand, the ALJ may elect to ask for and consider opinions from a medical expert on the nature and severity of Trujillo's impairment and whether the impairment equals the requirements of the pertinent Listing criteria. This may be particularly true here where the medical consultant disagreed with the treating orthopedic physician's conclusion that Trujillo was unable to work based on the consultant's view that medication would assist Trujillo, at least pending surgery. [Tr. at 115.]

In addition, should the ALJ again conclude that Trujillo did not meet the Listing criteria and proceed to determine Trujillo's RFC and make step 5 findings, he should fully discuss and explain the evidence of any nonexertional factors, such as pain[17] or depression, that may affect the RFC. If, for example, a physical condition that could reasonably be expected to cause pain is revealed by objective medical evidence, the ALJ must evaluate the disabling effects of that pain as demonstrated through

---

[17]The Court notes that the ALJ seemed to discount Trujillo's complaints of pain to some extent because Trujillo did not see Dr. Lipscomb regularly or repeatedly. While Trujillo's treatment with Dr. Lipscomb may have been sporadic (seen on 10/15/98, 8/13/99, and 3/23/00), rational explanations may exist for that irregular treatment especially here where Trujillo has consistently stated he does not have insurance coverage or the financial means to afford surgery and medications. The Court also recognizes that one of these medical records was not before the ALJ, but was later presented to the Appeals Council.

subjective evidence.  Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990).  The ALJ should also be aware of and discuss, as needed, the factors to consider in evaluating subjective allegations of pain as set forth by the Tenth Circuit in Kepler v. Chater, 68 F.3d 387, 390-91 (10th Cir. 1995).  Those factors are:  (1) whether the objective medical evidence establishes a pain-producing impairment; (2) if so, whether there is a loose nexus between the proven impairment and the claimant's subjective allegations of pain; and 3) if so, whether considering all the evidence, claimant's pain is in fact disabling.

Also, if the ALJ finds a severe combination of impairments at step 2, a failure to meet the Listing requirements at step 3 and then relies exclusively on the grids at step 5, the Court notes that exclusive application of the grids may result in inconsistencies.  For example, a finding at step 2 that an impairment is severe means that the impairment "significantly limits [Trujillo's] ability to do basic work activities, i.e., 'the abilities and aptitudes necessary to do most jobs.'"  Williams v. Bowen, 844 F.2d 748, 752 (10th Cir. 1988).  At step five, the grids cannot be applied conclusively if a plaintiff, as may be the case here, has nonexertional limitations that significantly limit his "ability to perform the full range of work in a particular RFC" category on a sustained basis.  Teter v. Heckler, 775 F.2d 1104, 1105 (10th Cir. 1985).  In Tafoya v. Barnhart, CIV No. 01-489 BB/DJS (D.N.M. April 30, 2002) [Recommended Disposition, Doc. 12], United States Magistrate Judge Svet determined that where a plaintiff has a severe mental impairment, it follows that she cannot perform a full range of work in the sedentary category.

Because the Court is remanding for a further administrative hearing on the ALJ's step 3 findings, the Court does not reach the remaining arguments for reversal set out in Trujillo's motion.

21

IT IS THEREFORE ORDERED that Trujillo's motion to reverse or remand is granted and that this proceeding is remanded for additional analysis and findings before the administrative law judge.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge